IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| FIRSTLINE CORPORATION, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | Civil Action No. |
| | : | 7:03-CV-142 (HL) |
| VALDOSTA - LOWNDES COUNTY | : | |
| INDUSTRIAL AUTHORITY, | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## ORDER

Before the Court is Defendant's Motion for Summary Judgment (Doc. 8). After consideration of the pleadings, depositions, affidavits, and briefs, the Court hereby grants Defendant's Motion for Summary Judgment for the reasons explained below.[1]

I.   FACTUAL HISTORY

A. Plaintiff's Attempted Expansion

Plaintiff is a manufacturing company that first relocated to the Valdosta area in 1976. (Murphy Dep. 4:17-18.) At that time, Plaintiff contacted Defendant, the Valdosta-Lowndes County Industrial Authority, and was directed to meet with local businessman, N.L. Bassford, in order to lease necessary warehouse space. (Murphy Aff. ¶ 3.) Plaintiff initially entered into

---

[1] Plaintiff, in its Memorandum of Law in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment, requests the Court grant partial summary judgment by declaring that Defendant has violated the equal protection laws with respect to Plaintiff. Because Plaintiff's alleged motion is not properly filed and the Court finds Plaintiff's claims time-barred, Plaintiff's so-called Motion for Partial Summary Judgment is denied.

a five-year lease with Bassford for manufacturing and warehouse space. (Murphy Dep. 6:23-25.) In 1990, Bassford's son constructed a building (hereinafter "Bath Craft"), which Plaintiff eventually leased, on property to the west of Plaintiff's plant. (Murphy Dep. 7:6-19; Murphy Aff. ¶ 6.) Although Plaintiff tried to purchase the Bath Craft property, the Bassfords were never persuaded to sell the property. (Murphy Dep. 8:20-9:12.) In 1997, Plaintiff acquired an option to purchase twenty acres of land from Defendant for expansion purposes. (Murphy Aff. ¶ 9.) During the agreed-upon option period, Defendant sold approximately seven acres of land that Plaintiff believed was covered under its option. (Murphy Aff. ¶ 9.) After a protracted legal battle, Plaintiff's option to purchase the property was declared void. (Murphy Aff. ¶ 10.)

### B. Plaintiff's Assistance Package

Still seeking property for expansion, Plaintiff, in 1999, contacted Bassford to discuss purchasing property (hereinafter "Shelter Components") with an existing building located adjacent to Plaintiff's manufacturing operation. (Murphy Aff. ¶ 12.) After Bassford would only agree to sell the property for what Plaintiff believed to be an outrageous price,[2] Plaintiff asked Defendant for help. (Murphy Aff. ¶ 12.)

Defendant, on Plaintiff's behalf, secured an option to purchase the same property from Bassford for $800,000.00. (Murphy Aff. ¶ 12.) Defendant exercised its option in November of 1999 and agreed to temporarily finance a large portion of the purchase price with Bassford for one month.  (Murphy Aff. ¶ 12.) A tentative agreement between Plaintiff and Defendant was

---

[2]According to Plaintiff, Bassford would not sell the property for less than 1.5 million dollars. (Murphy Aff. ¶ 12.)

then reached, and that agreement was memorialized in a Letter of Intent dated December 20, 1999. (Murphy Aff. ¶ 12; Murphy Dep., Ex. 8.) Defendant agreed that it would purchase the Shelter Components property; enter into a development agreement; lease the property to Plaintiff for ten years; and assist Plaintiff in securing job tax credits, property tax abatements, and tax free bond financing. In return, Plaintiff agreed to expend specific amounts of capital on expansion and employ a number of new employees.  (Murphy Dep., Ex. 8.)

On December 23, 1999, Plaintiff's Chief Executive Officer Donald J. Murphy loaned Defendant $650,000.00. (Murphy Dep., Ex. 10.) In exchange Defendant gave Murphy a promissory note and a security deed to the property. (Murphy Dep., Ex. 9-11.) Defendant then used its own money in combination with the money Murphy loaned it to pay the balance of the property's purchase price that was still owed to Bassford. (Murphy Aff. ¶ 14.) At that time, Defendant informed Plaintiff that it anticipated signing the development agreement and lease on or before April 12, 2000. (Murphy Dep., Ex. 9.) In early 2000, the parties exchanged numerous drafts of the proposed agreements, but none were ever signed. (Murphy Aff. ¶ 20; Murphy Dep., Ex. 13-15.) On March 28, 2000, Defendant quitclaimed the Shelter Components property to Murphy and he executed a satisfaction of the security deed he held on the property. (Murphy Dep. 43:7-17.)

### C. Lettica's Assistance Package

In 1997, Lettica Corporation, an existing industry operating in Lowndes County, approached Defendant about assistance with its expansion needs. (Garren Dep. 31:6-11.) Lettica

3

was landlocked at its then location and wanted Defendant to assist it in purchasing land in order to relocate its entire operation. (Garren Dep. 31:8-11.) Because Defendant had no property that had easy access to the railroad, Defendant decided to create a new industrial park, with the purchase of over one hundred acres of land, and offer a portion of that land to Lettica. (Garren Dep. 31:16-25, 32:3-13, 33:14-18.) After purchasing the land Defendant, with the help of funding from the state, extended the existing railroad line into the new industrial park. (Garren Dep. 32:3-11.) On May 16, 2000, Defendant entered into an intent agreement with Lettica concerning Lettica's proposed expansion. (Garren Supp. Aff.,  Ex. 3.) Lettica agreed to invest at least five million dollars in constructing a facility and employ on average a total of 110 full time employees. (Garren Supp. Aff.,  Ex. 3.) In return, Defendant agreed to give Lettica thirty acres of land in the new industrial park, own and lease the proposed facility to Lettica in order to save Lettica property taxes, and assist Lettica in obtaining various applicable tax credits, including new employee credits. (Garren Supp. Aff., Ex. 3.) Defendant and Lettica subsequently entered into a lease and development agreement according to the terms of the intent agreement.

### D. Plaintiff's Present Claim

For reasons that are not clear from the record, on April 1, 2003, Defendant sent Plaintiff a letter that reads in relevant part, "In regard to your request for the Authority to revisit the terms and conditions of the Letter of Intent dated December 20, 1999, this is to advise that I have reviewed the records with staff and it is my position . . . [that] you elected to receive title [to the Sheltered Components property] on or about March 28, 2000, which therefore fulfilled

4

the obligation of the Authority." (Murphy Aff. ¶ 20; Gupton Dep., Ex. 4.)

Plaintiff, on December 17, 2003, brought suit under 42 U.S.C. § 1983 alleging two constitutional violations.(Compl. ¶ 8.) Plaintiff first alleges Defendant treated other entities similarly situated more favorably than Plaintiff in violation of the Fourteenth Amendment. Second, Plaintiff alleges Defendant violated the First Amendment by treating it unfairly in an attempt to retaliate against it for Murphy's past criticism[3] and legal action.

## II.    CONCLUSIONS OF LAW

Defendant's Motion for Summary Judgment raises five issues: (1) Plaintiff's claims are time-barred, (2) Plaintiff has not satisfied the conditions of the letter of intent, (3) Defendant has not treated Plaintiff differently than other similarly situated entities, (4) Defendant has not prohibited or restricted Plaintiff's right to speak, and (5) Plaintiff has suffered no damages. Because the Court finds that Plaintiff's claims are barred by the applicable statute of limitations, the Court will not address Defendant's remaining issues.[4]

Claims brought under 42 U.S.C. § 1983 are measured by the personal injury statute of limitations period of the state in which the claim arose. Wilson v. Garcia, 471 U.S. 261, 269, 105 S. Ct. 1938, 1943 (1985). It is clearly established that the statute of limitations period for such claims arising from events in Georgia is two years.   Thigpen v. Bibb County Sheriff's

---

[3]Plaintiff asserts that Murphy has been highly critical of the acts and actions of Defendant. (Murphy Dep., Ex. 25, ¶ 2.)

[4]The Court offers no opinion as to whether Plaintiff's claims could be established by the evidence submitted.

Dept., 223 F.3d 1231, 1248 (11th Cir. 2000). Thus, only Plaintiff's claims that accrued after December 19, 2001, which is two years before the present complaint was filed, are properly before the Court.

Although state law sets the applicable statute of limitation period, federal law determines when the limitations period begins to run. Mullinax v. E.B. McElhenny, 817 F.2d 711, 716 (11th Cir. 1987). "The general federal rule is that 'the statute [of limitations] does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" Rozar v. Mullis, 85 F.3d 556, 561-62 (11th Cir. 1996) (quoting Mullinax, 817 F.2d at 716) (citations omitted).  Accordingly, "Section 1983 actions do not accrue until the plaintiff knows or has reason to know that he has been injured" and "is aware or should be aware who has inflicted the injury."  Mullinax, 817 F.2d at 716.  "This rule requires a court to first identify the alleged injuries, and then to determine when [a plaintiff] could have sued for them." Rozar, 85 F.3d at 562. Accordingly, the Court will first identify Plaintiff's alleged injuries and then determine whether  Plaintiff knew, or should have known, that it had been injured by Defendant prior to December 19, 2001.

In the present case, Plaintiff brought suit pursuant to 42 U.S.C. § 1983 alleging Defendant violated its First and Fourteenth Amendment rights. [5] Plaintiff alleges Defendant

---

[5]Further, although Plaintiff's Surrebuttal to Defendant's Reply Brief might indirectly raise a breach of contract claim, Plaintiff has not amended, nor sought permission to amend its complaint. Therefore, the Court will only address Plaintiff's two constitutional claims. See Chavis v. Clayton County Sch. Dist., 300 F.3d 1288, 1291 n.4 (11th Cir. 2002) (holding an issue first raised in response to a summary judgment motion, where the plaintiff did not seek to amend his complaint, is not properly before the court).

violated the Fourteenth Amendment because (1) Defendant entered into a lease and development agreement with other companies, yet failed to enter into either with Plaintiff and (2) Defendant offered other companies more financial assistance with expansion plans than Defendant offered Plaintiff. (Compl. ¶¶ 7, 9.)  Plaintiff's First Amendment claim attempts to characterize Defendant's unequal treatment as an attempt to retaliate against it due to Murphy's First Amendment activities; Murphy was and continues to be a vocal critic of Defendant. (Compl. ¶ 8.)

### A. Equal Protection Claim

Plaintiff's Complaint alleges that Defendant has "treated other individuals and companies similarly situated differently and more favorably than [Plaintiff]" and "failed to proceed under the letter of intent to [agree to] a written 'indenture of lease' and 'development agreement.'" (Compl. ¶¶ 6, 10.) The complaint then alleges these actions by Defendant caused higher costs of and delays in expansion and higher taxation. (Compl. ¶ 9.) Plaintiff further clarifies its injury in Plaintiff's Response to Motion for Summary Judgment; Plaintiff's damages include the difference between the amount of assistance given to another company over Plaintiff, lost tax abatements, and lost new hire employee tax credits. (Pl.'s Mem. Law ¶ H.) The essence of Plaintiff's equal protection claim is that another similarly situated company, Lettica, received more assistance from Defendant than did Plaintiff. Essentially, Plaintiff asserts that Defendant offered Lettica a better price on land it wanted to purchase for expansion, more financial assistance, and entered into a lease and development agreement. Accordingly, Plaintiff asks for

(1) the difference in the dollar amount of assistance and (2) the value of the lost tax abatement and credits it did not receive as damages.

Plaintiff first alleges it was injured when Defendant offered Lettica a better assistance package. Plaintiff argues that the assistance package Defendant offered it was unfair because it did not contain enough assistance. Accordingly, Defendant caused this alleged injury when it initially offered Plaintiff its assistance package. Second, under the letter of intent, Plaintiff was to receive a property tax credit on property that it leased from Defendant and assistance in receiving state tax credits for hiring new employees. Both offers were contingent, in part, on the execution of a lease and development agreement between Plaintiff and Defendant. When no lease or development agreement was ever signed, Plaintiff failed to receive the tax abatement or assistance in obtaining new employee credits. Therefore, these alleged injuries were caused by Defendant when it refused to sign a lease or development agreement. Accordingly, any injuries Plaintiff suffered were caused either when Defendant offered the assistance package to Plaintiff or when Defendant refused to sign a lease and development agreement.

Having determined the alleged injuries, the Court must now determine whether the Plaintiff knew or should have known it had been injured by the Defendant prior to December 19, 2001. Regardless of when Plaintiff first became, or should have become, aware of its injuries, Plaintiff clearly knew it had been injured on April 17, 2001. According to the transcript[6] of an industrial authority meeting, held that day, Plaintiff's CEO, Donald J. Murphy,

---

[6]According to Murphy's deposition, his secretary typed the transcript and it accurately reflects what was said in the meeting. (Murphy Dep. 78:21-79:16.)

appeared on behalf of Plaintiff to address the authority. (Murphy Dep., Ex. 23.) Murphy stated that the authority was treating his company unfairly and that he could document such treatment. (Murphy Dep., Ex. 23.) He further asked why the authority signed a lease and development agreement with another company, yet refused to sign either with his company. (Murphy Dep., Ex. 23.) In response, the authority's attorney stated, "We would have done the same thing with you Mr. Murphy had you decided to go through with your bond issue, etc." (Murphy Dep., Ex. 23.) Later in the meeting Murphy stated,

> I put money on the line and I'm not asking a nickel from the Industrial Authority but you're punishing me. Now I'm telling you, this is the last time, you can consider it a threat, so be it. You want another lawsuit, but this will be a good one. It will not be in Lowndes County, it will be at Federal Court. . . . The question will be; Why, why, won't the Industrial Authority help Firstline? I've got the facts and you don't.

(Murphy Dep., Ex. 23.)

Without reaching a decision on the merits of the case, it is clear from Murphy's statements that Plaintiff knew, on April 17, 2001, the assistance package offered to it was unfair, in light of the assistance being given to other companies; that Defendant did not, and would not, sign a lease and development agreement; and that the failure to sign those agreements caused it damage. Further, it is also clear from Murphy's statements that Plaintiff had already contemplated legal action by the date of the meeting.  Thus, Plaintiff's equal protection claim accrued, at the latest, on April 17, 2001. Because Plaintiff's Complaint was filed more than two years later, Plaintiff's equal protection claim is untimely.

### B. Plaintiff's First Amendment Claim

In addition to the claims and injuries addressed above, Plaintiff's Complaint also alleges Defendant "arbitrarily and maliciously punished the Plaintiffs [sic] because of Plaintiff's opposition to prior acts and actions taken by [Defendant]." (Compl. ¶ 8.) According to the Complaint, Defendant's unequal treatment of Plaintiff in failing to offer a fair assistance package and refusing to sign a lease and development agreement was an attempt to punish or retaliate against Plaintiff for Murphy's vocal opposition to Defendant's past actions. As a result, Plaintiff suffered higher costs of expansion and lost any proposed property tax and new employee tax credits. Because these injuries are identical to those claimed in Plaintiff's equal protection claim, the Court will not again discuss the intricacies of Plaintiff's injuries. As discussed above, Murphy's statements show Plaintiff knew it was injured and who caused the injury at the time of the April meeting. Accordingly, Plaintiff's First Amendment retaliation claim also accrued, at the latest, on April 17, 2001. Because Plaintiff did not file within two years from that date, its First Amendment claim is also untimely.

Although the Complaint contains no specific allegation of a direct restriction on Plaintiff's right to speak, Plaintiff's summary judgment response alleges that Defendant placed a police officer behind Murphy in order to intimidate him at an authority meeting. Without discussing the merits of the claim, it is clear from statements by Murphy that any claim stemming from this alleged incident is also untimely. Murphy, in the same April 17, 2001, authority meeting, explains "it was at a meeting that I recall very vividly in February 1997 when

you called the Deputy Sheriff to stand behind me at that meeting." (Murphy Dep., Ex. 23.) Thus, the alleged incident occurred in 1997. Further, Murphy was aware, at in 1997, of any injury he or Plaintiff suffered at that time and knew who was responsible for such injury. Accordingly, any attempt to recover damages from the 1997 incident in the present case, filed some six years later, is also untimely.

### C. Plaintiff's Arguments

Plaintiff first argues that its claim did not accrue until April 1, 2003. It was on this date that Plaintiff received a letter from Defendant that notified Plaintiff of the Defendant's "full rejection."  (Gupton Dep., Ex. 4.) The letter in question clearly states that it is in response to Plaintiff's request to revisit the terms of the letter of intent. The letter also explains that Defendant believed that any problems involving the letter of intent were resolved in March of 2000 when Murphy purchased, as opposed to leased, the property.  Plaintiff's attempt to use this letter to restart the statute of limitations period is without merit. A claim does not accrue when one party is absolutely convinced that the dispute cannot be remedied or settled; a claim accrues when the injured party is or should be aware of the facts that create the dispute. As discussed above, this clearly happened before Plaintiff received the April 1, 2003 letter.

Plaintiff also argues, in the alternative, that its claim is not time barred due to the continuing violation doctrine. In support of its argument, Plaintiff asserts Defendant's discrimination and unequal treatment of Plaintiff has been a continuing violation since 1975. Contrary to Plaintiff's assertion, the continuing violation doctrine cannot save its claim. The

doctrine saves a time-barred claim by allowing a plaintiff to combine its time-barred claim with a timely-filed claim in order to form one continuing violation, part of which occurred during the limitations period. See Roberts v. Gadsden Mem'l Hosp., 835 F.2d 793, 800 (11th Cir. 1988). Here, all of Plaintiff's asserted claims are time barred. Thus, Plaintiff has no timely claim with which its untimely claims can be combined. Accordingly, the Court cannot even attempt to apply the continuing violation doctrine.

### III.   CONCLUSION

In conclusion, for the reasons set forth above, Plaintiff's claims are time-barred. Therefore, Defendant's Motion for Summary Judgment is granted. There being no further claims remaining, let judgment be entered accordingly.

**SO ORDERED**, this the 21st  day of September, 2005.


s/ Hugh Lawson
**HUGH LAWSON, Judge**


scs

12